**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE CONFEDERATED TRIBES OF THE GRAND RONDE COMMUNITY OF OREGON,** *et al.*, | |
| **Plaintiffs,** | **Civil Action No. 13-849 (BJR)** |
| **v.** | **MEMORANDUM OPINION** |
| **SALLY JEWELL,** *et al.*, | |
| **Defendants.** | |

**DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT; GRANTING
DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This consolidated action[1] arises under the Administrative Procedure Act (APA), 5 U.S.C.

§ 551 *et seq*., the Indian Reorganization Act (IRA), 25 U.S.C. § 461 *et seq*., the Indian Gaming

Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, and the National Environmental Policy Act

(NEPA), 42 U.S.C. § 4321 *et seq.*  Plaintiffs challenge the Secretary of the Department of

Interior's decision to acquire and hold in trust approximately 152 acres in Clark County,

Washington for the Cowlitz Indian Tribe, the Intervenor-Defendant.  Plaintiffs further challenge

the Secretary's decision to allow gaming on that land, and dispute whether the Secretary has

complied with NEPA's requirements.  Before the Court are the parties' cross-motions for

summary judgment.  Having considered the record herein together with the parties' briefs the

Court denies the Plaintiffs' motions for summary judgment and grants the Defendants' motions

for summary judgment.  The Court's reasoning follows:

---

[1] Civil Action No. 13-849 and Civil Action No. 13-850 were consolidated on July 18, 2013.

## II. BACKGROUND

### A. Legal Framework

The Secretary's decision was arrived upon consideration of a complex combination of statutes, procedures, and regulations, a brief description of which follows:

### 1. Indian Reorganization Act of 1934

"The IRA was designed to improve the economic status of Indians by ending the alienation of tribal land and facilitating tribes' acquisition of additional acreage and repurchase of former tribal domains.  Native people were encouraged to organize or reorganize with tribal structures similar to modern business corporations."  1-1 Cohen's Handbook of Federal Indian Law § 1.05.  "The overriding purpose of [the IRA] was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically."  *Morton v. Mancari*, 417 U.S. 535, 542 (1974).

Among other things, the IRA provides the Secretary with the authority "to acquire . . . any interest in lands . . . for the purpose of providing land for Indians."  25 U.S.C. § 465.  "Title to any lands . . . acquired pursuant to [the IRA] . . .  shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands . . . shall be exempt from State and local taxation."  *Id.*  Lands taken in trust by the United States can be designated as part of an Indian Tribe's reservation.  *Id.* § 467.

Section 19 of the IRA defines "Indian" to include, *inter alia*, "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction."  *Id.* § 479.  While the IRA does not elaborate on what it means to be a "recognized Indian tribe now under Federal jurisdiction," the Supreme Court recently interpreted the phrase "now under Federal jurisdiction."  In doing so it reasoned that when Congress refers to a tribe that was "now

under federal jurisdiction," it used the word "now" to mean the date that the IRA was enacted, which was 1934.  *Carcieri v. Salazar*, 555 U.S. 379, 382 (2009).

### 2.  Federal Acknowledgment Process

In 1978, the Department of Interior established a "departmental procedure and policy for acknowledging that certain American Indian groups exist as tribes."  25 C.F.R. § 83.2.  This process was "intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present."  *Id.* § 83.3.  Such acknowledgment was necessary to receive "the protection, services, and benefits of the Federal government available to Indian tribes by virtue of their status as tribes," as well as "the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship with the United States." *Id.* § 83.2.  An Indian tribe acknowledged under this procedure would "subject the Indian tribe to the same authority of Congress and the United States to which other federally acknowledged tribes are subjected."  *Id.*

The Regulations specified the criteria that a tribe must demonstrate to achieve Federal acknowledgment.  *Id.* § 83.7-83.8.  Among other requirements, the tribe must have been "identified as an American Indian entity on a substantially continuous basis since 1900," and a "predominant portion" of the tribe must "comprise[] a distinct community" and must have "existed as a community from historical times until the present."  *Id.* § 83.7(a)-(b).

### 3.  Indian Gaming Regulatory Act of 1988

Like the IRA, the IGRA was enacted in large part to promote "tribal economic development, self-sufficiency, and strong tribal governments."  25 U.S.C. § 2702(1).  To this end, the IGRA provided "a statutory basis for the operation of gaming by Indian tribes."  25

U.S.C. § 2702(1); *see also Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460,

462 (D.C. Cir. 2007).  The IGRA generally prohibits Indian gaming on lands acquired after

October 17, 1988.  25 U.S.C. § 2719.  However, there are exceptions.

Of particular relevance here, the IGRA allows gaming if "lands are taken into trust as part

of . . . (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the

Federal acknowledgment process, or (iii) the restoration of lands for an Indian tribe that is

restored to Federal recognition."  *Id.* § 2719(b)(1)(B).  For brevity, these exceptions are referred

to herein as the "initial reservation" exception and the "restored lands" exception, respectively.

### 4.  National Environmental Policy Act

NEPA requires federal agencies to issue an Environmental Impact Statement (EIS) for

any "major Federal action significantly affecting the quality of the human environment."  42

U.S.C. § 4332(2)(C).  The EIS must discuss in detail, *inter alia*, "(i) the environmental impact of

the proposed action, (ii) any adverse environmental effects which cannot be avoided should the

proposal be implemented,[and] (iii) alternatives to the proposed action."  *Id.*

Because the NEPA process "involves an almost endless series of judgment calls . . . [t]he

line-drawing decisions . . . are vested in the agencies, not the courts."  *Coalition on Sensible*

*Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Therefore, the "role of the courts is

simply to ensure that the agency has adequately considered and disclosed the environmental

impact of its actions and that its decision is not arbitrary or capricious."  *City of Olmsted Falls,*

*Ohio v. Fed. Aviation Admin.*, 292 F.3d 261, 269 (D.C. Cir. 2002) (citing *Baltimore Gas & Elec.*

*v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983)).

**B.  Factual & Procedural Background**

The Cowlitz Indian Tribe (hereinafter, Cowlitz or Tribe) is the successor in interest of the Lower Cowlitz and the Upper Cowlitz Bands of Southwestern Washington.   The Tribe has been without land since President Lincoln signed a proclamation in 1863 that opened the Cowlitz lands in southwest Washington to non-Indian settlement.  A.R. 8200; A.R. 14048762; Fed. Reg. 8,983-01 (Feb. 27, 1997).

In 2002,[2] the Department of Interior federally acknowledged the Cowlitz after finding that the Tribe had existed as an Indian entity on a substantially continuous basis since at least 1878-80 and that it had satisfied the criteria set forth in 25 C.F.R. part 83.  67 Fed. Reg. 607 (Jan. 4, 2002); 65 Fed. Reg. 8,436 (Feb. 18, 2000).  Immediately upon receiving federal acknowledgment, the Cowlitz submitted an application requesting that the Secretary take into trust 151.87 acres of land in Clark County, Washington (hereinafter, "the Parcel") and declare it the Tribe's "initial reservation" under the IRA.  A.R. 140382.  The Tribe claimed its purpose was to "create a federally-protected land base on which the Cowlitz Indian Tribe can establish and operate a tribal government headquarters to provide housing, health care, education and other governmental services to its members, and conduct the economic development necessary to fund these tribal government programs, provide employment opportunities for its members, and allow the Tribe to become economically self-sufficient."  A.R. 140383.  To further that goal, the Cowlitz Tribe, currently landless, intends to develop the Parcel to establish 20,000 square feet of tribal government offices, sixteen elder housing units, a 12,000 square foot tribal cultural center and a casino-resort complex consisting of 134,150 square feet of game floor; 355,225 square feet

---

[2]        The Federal acknowledgment was first issued in February 2000, but that decision was reconsidered and reaffirmed on January 4, 2002.  67 Fed. Reg. 607 (Jan. 4, 2002).

of restaurant and retail facilities and public space; 147,500 square feet of convention and multi-purpose space; and an eight story 250-room hotel.  BIA ROD at 2, 115.

A tribe must seek approval for casino-style gambling from the National Indian Gaming Commission (NIGC), an independent federal regulatory agency within the Department of Interior.  25 U.S.C. § 2706.  In August 2005, the Cowlitz submitted its proposed tribal gaming ordinance for review, which the NIGC eventually approved.  A.R. 8193.

As part of the tribal gaming ordinance review process, the NIGC issued an opinion in November 2005 which found that the Parcel qualified for IGRA's 'restored lands' exception to the general prohibition on gaming.  *Id.*  More specifically, NIGC concluded that "the Cowlitz Tribe is a restored tribe and that if the United States Department of Interior accepts the [Parcel] into trust for the Tribe, such trust acquisition will qualify as the "restoration of lands" within the meaning of the [IGRA]."  A.R. 008195.  For the Cowlitz to be considered an "Indian Tribe that is restored to Federal recognition," as that term is used in IGRA, the Cowlitz had to demonstrate "a history of 1) government recognition; 2) a period of non-recognition; and 3) reinstatement of recognition."  A.R. 008198.  The NIGC concluded that the Federal government had recognized the Cowlitz during the latter half of the 1800s and then "did not recognize the Cowlitz Tribe as a governmental entity from at least the early 1900s until 2002," at which point the Tribe received formal Federal acknowledgment under 25 C.F.R. part 83.  A.R. 008199.

The NIGC explicitly noted in its November 2005 opinion that if the Secretary accepted the Parcel into her trust, the Department of Interior could proclaim the Parcel to be the Tribe's initial reservation.  According to the NIGC, "[a]n 'initial reservation proclamation would provide

6

a second basis by which the [P]arcel would qualify as Indian lands on which the Tribe could conduct gaming."[3]   A.R. 8195.

The Tribe's application to take the Parcel into federal trust prompted the NEPA process. The Bureau of Indian Affairs issued a draft Environmental Impact Statement (EIS) concerning the proposed actions surrounding the Parcel.  After a period of public comment, the final EIS was issued on May 30, 2008.  AR140377; 75768-76440.

In April 2013,[4] the Secretary of the Department of the Interior (hereinafter, Secretary) through her designee, the Assistant Secretary of Indian Affairs issued a Record of Decision ("ROD" or "the decision") accepting the Parcel into trust and declaring that gaming would be allowed on the land.  Specifically, the Secretary determined that the Parcel qualified for gaming under IGRA's "initial reservation" exception to the general ban on gaming.  A.R.140494-518. The ROD did not discuss whether the Parcel would qualify under IGRA's "restored lands" exception.

Plaintiffs are entities and individuals who, for varying reasons, oppose the construction of the Cowlitz casino-resort complex.  The first action was brought by Plaintiff Confederated Tribes of the Grand Ronde Community of Oregon ("Grand Ronde") which owns and operates a casino that would compete with any future casino built on the Parcel.  The second action was brought by Clark County, Washington, the City of Vancouver, homeowners and community members in

---

[3]      At the time of the NIGC's ruling, a tribe could obtain both a NIGC finding of restored lands and still have their reservation declared their initial reservation.  In 2008, the regulations were amended so that a tribe can no longer avail itself of both the restored lands exception and the initial reservation exception.  25 C.F.R. § 292.6 (Aug. 25, 2008).

[4]      The Secretary first issued a Record of Decision in 2010 and a lawsuit was immediately filed challenging that decision.  *See Confederated Tribes of the Grand Ronde Community of Oregon v. Salazar et al.*, Civil Action No. 11-284.  While that lawsuit was pending, in 2012, the Secretary revised and supplemented her 2010 decision.  Because the Secretary lacked the authority to supplement the 2010 Record of Decision while a lawsuit was ongoing, this Court instructed the agency to rescind the 2010 Decision and issue a new decision within sixty days.  *Id.* Dkt. # 83, Order (March 13, 2013).

the area surrounding the Parcel, and specific businesses (clubs and card rooms) that would also be forced to compete with the future casino (collectively, Clark County Plaintiffs).

Plaintiffs argue that the Secretary violated the APA and NEPA. Specifically, Plaintiffs challenge: (1) the decision to accept into federal trust the Parcel pursuant to Section 5 of the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 461 *et seq*.; (2) the decision to allow the Cowlitz to conduct gaming activities on the Parcel once the Secretary has accepted the land into trust; and (3) the Secretary's compliance with the NEPA.

## II.  STANDARDS OF REVIEW

The APA instructs the reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The standard of review is narrow, and "[t]he court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99, 104 (1977).

When reviewing the substance of an agency's interpretation of a law it administers, the court must apply the principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, the first step begins with the statute. The court must examine the statute to determine whether Congress has spoken directly to the precise question at issue. *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 322 (D.C. Cir. 2011). Such an examination requires the court to use "the traditional tools of statutory interpretation—text, structure, purpose, and legislative history." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (quoting *Pharm. Research & Mfs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001)). If the court determines that Congress has directly spoken to the precise issue,

that is the end of the analysis, "for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

If the statute is "silent or ambiguous with respect to the specific issue," then the court proceeds to the second step of *Chevron*. *Chevron*, 467 U.S. at 843. The court must determine whether the agency's response to the question at issue is reasonable and based on a permissible construction of the statute. *Id.* If the agency provides a reasonable interpretation of the statute, the court must defer to the agency's interpretation. *Am. Library Ass'n v. FCC*, 406 F.3d 689, 699 (D.C. Cir. 2005). The agency's interpretation need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original). Moreover, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron*, 467 U.S. at 844. The court is "principally concerned with ensuring that [the Agency] has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made,' that the Agency's 'decision was based on a consideration of the relevant factors,' and that the Agency has made no 'clear error of judgment.'" *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Finally, when interpreting an ambiguous statutory provision involving Indian affairs, "the governing canon of construction requires that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1266 n.7 (D.C. Cir. 2008). However, the Indian canon of construction does not apply for the benefit of one tribe if its application would adversely affect

the interests of another tribe.  *Confederated Tribes of Chehalis Indian Reservation v.*

*Washington*, 96 F.3d 334, 340 (9th Cir. 1996).

## III.  ANALYSIS

**A.     The Secretary Did Not Violate the APA in Concluding that the IRA Authorizes Her to Acquire the Parcel in Trust for the Cowlitz**

Plaintiffs argue that the Secretary lacks the authority to acquire land in trust for the

Cowlitz because the tribe is neither "recognized" nor "under Federal jurisdiction," as required by

Section 19 of the IRA.  Clark Cty Mot. at 9; Grand Ronde Mot. at 8.   Furthermore, Clark

County Plaintiffs maintain that the Tribe's membership expansion since its Federal

acknowledgment violated federal regulations, and, therefore, the Secretary's decision to acquire

the land in trust is void.  Clark Cty Mot. at 9.  In this section, the Court analyzes the parties'

positions regarding: (1) whether the Cowlitz are a "recognized" Indian Tribe; (2) whether the

Cowlitz are an Indian Tribe "now under Federal jurisdiction;" and, lastly, (3) whether the

Secretary violated the pertinent regulations by not reviewing Cowlitz's membership numbers.

### 1.  Recognition

#### a.  The Secretary's Decision

As described earlier, the IRA authorizes the Secretary to acquire land in trust for

"Indians," a term which is defined in Section 19 of the IRA to include, *inter alia*, "members of

any recognized Indian tribe now under Federal jurisdiction."  25 U.S.C. § 479.  The Secretary's

decision determined that the Cowlitz was "recognized" under the IRA.  ROD 87-89.  The

Secretary reasoned that the term "recognized" had historically been used in two distinct senses:

(1) the "cognitive" or "quasi-anthropological" sense, under which an official "simply knew or

realized that an Indian tribe existed," and (2) "the more formal or 'jurisdictional' sense to

connote that a tribe is a governmental entity comprised of Indians and that the entity has a unique

relationship with the United States." ROD at 87 (A.R. 140468). The formal or jurisdictional sense of recognition, the Secretary explained, evolved into the modern notion of "federal recognition" or "federal acknowledgment" in the 1970s, and eventually regulations established procedures pursuant to which an entity could demonstrate its status as an Indian tribe. *Id.*

Ultimately, however, the Secretary did not "reach the question of the precise meaning of 'recognized Indian tribe.'" *Id.* at 89. The Secretary reasoned that "whatever the precise meaning of the term 'recognized tribe,' the date of federal recognition does not affect the Secretary's authority under the IRA" because "the IRA imposes no time limit upon recognition," and "the tribe need only be 'recognized' as of the time the Department acquires the land into trust." *Id.* The Secretary concluded that the Cowlitz tribe had been "recognized" since at least 2002, when it received federal acknowledgment, and therefore it satisfied the recognition requirement. *Id.*

### b. Parties' arguments

Plaintiffs argue that the phrase "now under Federal jurisdiction," (which under *Carcieri* strictly refers to tribes under jurisdiction in 1934) modifies the phrase "recognized Indian tribe," and both phrases should be temporally limited to 1934. In other words, Plaintiffs contend that a tribe must have been not only "under federal jurisdiction" in 1934 but also "recognized" in 1934 to qualify as an "Indian Tribe" under Section 19. Clark Cty Mot. at 10; Grand Ronde Mot. at 9. Plaintiffs point to the plain text as well as legislative history to support that the term "recognized" refers only to tribes "enrolled" in 1934. Grand Ronde Mot. at 10; Clark Cty Mot. at 12-13. Lastly, Plaintiff Grand Ronde argues that reading the phrase "recognized Indian tribe" in the context of the IRA as a whole supports that Congress intended the term "recognized" to mean tribes recognized in 1934. Grand Ronde Mot. at 10.

Defendants, unsurprisingly, maintain that the Secretary reasonably construed an ambiguous statutory term when she decided that there is no temporal limitation on recognition, and, therefore, the Court should defer to her interpretation.  Gov't Mot. at 27; Cowlitz Mot. at 30.

   **c.  *Carcieri v. Salazar***

The Supreme Court explained in *Carcieri v. Salazar*, 555 U.S. 379 (2009), that the phrase "now under Federal jurisdiction" meant that a tribe had to be under federal jurisdiction in 1934, the year the IRA was passed, in order to qualify under Section 19's definition of "Indian."  Less clear was whether an Indian Tribe also had to be "recognized" in 1934 to qualify as "Indian" under Section 19.  The *Carcieri* majority makes no attempt to interpret what the word "recognized" means, and instead concerns itself solely with the interpretation of the phrase "now under Federal jurisdiction."  *See id.* at 382 (holding that "§ 479 limits the Secretary's authority to taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934").  Had the *Carcieri* majority believed that an Indian tribe needed to be recognized as of 1934, it could have easily said so and made that part of its holding.  However, the majority chose not to follow that course, and instead held only that the phrase "now under federal jurisdiction" means tribes that were under federal jurisdiction in 1934.  By ignoring the concept of recognition altogether, the *Carcieri* opinion in no way supports Plaintiffs' position that the term recognized should be read in conjunction with the phrase "now under federal jurisdiction."

   Indeed, the only discussion of the term "recognized" in *Carcieri* directly contradicts Plaintiffs' arguments.  In his concurrence, Justice Breyer explains that recognition and jurisdiction may be treated as two separate concepts and notes that Section 19 "imposes no time

limit upon recognition." *Id.* at 399.  Additionally, Justices Souter and Ginsburg agreed with Justice Breyer that "[n]othing in the majority opinion forecloses the possibility that the two concepts, recognition and jurisdiction, may be given separate content" and that "the [IRA] imposes no time limit upon recognition." *Id.* at 400 (Souter, dissenting).  Accordingly, the *Carcieri* majority opinion does not support that the term "recognized" in Section 19 unambiguously refers only to tribes recognized as of 1934.  Moreover, the views expressed by Justices Breyer, Souter and Ginsburg support that, at the very least, Section 19 is ambiguous regarding whether a tribe must be "recognized" as of 1934 in order for its members to qualify as "Indians."

### d.  Plain Text

Plaintiffs urge that Section 19's plain text demonstrates that the term "recognized" refers to tribes recognized in 1934.  Plaintiffs analogize to hypothetical statutes to argue that a tribe cannot be a "recognized Indian tribe now under Federal jurisdiction" in 1934 if it was not a "recognized Indian tribe" in 1934.  Grand Ronde's Mot. at 10.  For instance, Plaintiffs liken Section 19 to a statute that applies to any state resident practicing medicine in 1934.  *Id.* Plaintiffs conclude that this hypothetical statute should not cover an individual who was practicing medicine in 1934 in a foreign country, but only became a state resident many years later.  *Id.*  Likewise, Plaintiffs argue, Section 19 should not cover a tribe who was under federal jurisdiction in 1934 but that was only recognized in recent years. *Id.*

While at first blush such comparisons seem appealing, they ultimately fail to persuade the Court.  The danger in analogizing to such selectively crafted hypothetical statutes is a point aptly made by Defendants' hypothetical statute proffered in response—a statute that provides benefits to any certified veteran wounded in 1934.  Def. Govt's Reply at 12 n11.  Such a statute, the

Government observes, could reasonably be interpreted to cover veterans who received certification after 1934, even if the veteran must have been wounded as of 1934.  Arguably, recognition of an Indian tribe, like certification of a wounded veteran, is a status that can be conferred years after the tribe has been under federal jurisdiction.  *Cf. Regions Hosp. v. Shalala*, 522 U.S. 448, 458 (1998) (agreeing with the D.C. Circuit that the phrase "recognized as reasonable" in the Medicare Act "by itself, does not tell us whether Congress means to refer the Secretary to action already taken or to give directions on actions about to be taken" and, therefore, "might mean costs the Secretary (1) has recognized as reasonable . . . , or (2) will recognize as reasonable . . . .").  Accordingly, the Court rejects Plaintiffs' results-oriented approach and their contention that the text of Section 19 unambiguously requires recognition as of 1934.

### e.  Legislative History

The ambiguity of the statutory term "recognized" is further confirmed by a review of Section 19's legislative history.  The Senate's Committee on Indian Affairs discussed Section 19's definition of "Indian"[5] during both the April 28, 1934 and May 17, 1934 hearings.  A.R. 135115.  At the April 28th hearing, Senator Elmer Thomas of Oklahoma expressed concern that in the past "when an Indian was divested of property and money" he was legally no longer considered an Indian and, as a result, "numerous Indians have gone from under the supervision of the Indian Office."  *Id.*  The following colloquy resulted between the Commissioner of Indian Affairs, John Collier, and Senator Thomas:

> Commissioner:    This bill provides that any Indian who is a member of a recognized tribe or band shall be eligible to Government aid.

---

[5]    At the time of these discussions, the proposed Section 19 defined "Indian" to include, in relevant part, "all persons of Indian descent who are members of any recognized Indian tribe . . ." and did not include the "now under federal jurisdiction" requirement.  A.R. 135269.

> Senator Thomas:   Without regard to whether or not [the Indian] is *now* under your
> supervision?
>
> Commissioner:      Without regard; yes.  It definitely throws open Government aid to
> those rejected Indians.

A.R. 135115 (emphasis added).  This discussion among the Committee suggests, therefore, that

the term "recognized tribe" includes Indians who were not under the Indian Bureau's supervision

in 1934.[6]

However, only a couple of weeks later, on May 17, 1934, another exchange took place

between the Committee members suggesting just the opposite.  Senator Thomas expressed

concern that only tribe members "under the authority of the Indian Office" would be covered

under the IRA, and "the policy [of the Indian Office] was not to recognize Indians except those

already under authority."  A.R. 135298.  Senator Thomas viewed the proposed act as excluding

"roaming bands of Indians" that were "not registered," "not enrolled," and "not supervised." *Id.*

The Chairman of the Committee, Senator Burton Wheeler, responded to Senator's Thomas

concern by explaining that, "[o]f course, this bill is being passed, as a matter of fact, to take care

of the Indians that are taken care of at the present time." *Id.*  Senator Wheeler later explained his

view that the IRA should not cover "Indians of less than half blood," "unless they are enrolled at

the present time."  A.R. 135298-135299.

Thus, in contrast to the April 28th discussion, the May 17th dialogue supports the notion a

"recognized Indian tribe" means a tribe that as of 1934 was "enrolled," "taken care of" or under

the supervision of the Government.  "The only conclusion that [the Court] can safely draw from

---

[6]       Such a definition of recognition that includes Indians not under supervision in 1934 strongly
undermines Plaintiffs' position that "recognized Indian tribe" refers to tribes that the United States had
formally acknowledged in a "jurisdictional or political sense" as of 1934.  Clark Cty Mot. at 14-15; Pl.
Grand Ronde at 18.

these seemingly contradictory passages is that 'the little legislative history that exists for [Section 19] is as ambiguous as the statute itself." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1015 (D.C. Cir. 1999) (quoting *Deaf Smith County Grain Processors, Inc. v. Glickman*, 162 F.3d 1206, 1212 (D.C. Cir. 1998)).

### f. Statutory Context

Finally, Plaintiff Grand Ronde argues that the term "recognized" in its statutory context supports that it unambiguously refers to tribes recognized in 1934. Grand Ronde Mot. at 11. Grand Ronde points to language in Section 19 and Section 18 to bolster this argument.

Section 19 includes three definitions of Indian, two of which are relevant to Plaintiff Grand Ronde's argument. The first, discussed at length above, includes "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479. Section 19's second definition for Indian includes "all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation." 25 U.S.C. § 479. Plaintiff Grand Ronde argues that "the Secretary's conclusion that a tribe can be 'recognized' some 70 years after 1934 is . . . impossible to square with section 19's second definition of Indian," because "[t]ribes 'recognized' in 2002 do not have 'descendants' living on reservations in 1934." Grand Ronde Mot. at 11; *see also* Clark Cty at 12 n.5. However, some of the Cowlitz members reportedly lived on the Quinault Reservation in 1934 despite the Cowlitz Tribe only receiving formal recognition in 2002. Cowlitz Reply at 4 n.4. Arguably, then, the descendants of these Cowlitz tribal members who lived on the Quinault Reservation in 1934 would qualify under Section 19's second definition of Indian. Accordingly, Section 19's second definition of Indian is not incompatible with the Secretary's interpretation that "recognized Indian tribe" includes tribes recognized after 1934.

Similarly, the Court is not persuaded that Section 18 poses a challenge to the Secretary's interpretation of "recognized."  *See* Grande Ronde's Mot. at 11.  Section 18 states that the IRA "shall not apply to any reservation wherein a majority of the adult Indians . . .  shall vote against its application" in a special election called one year after the IRA's passage and approval.  25 U.S.C. § 478.  Plaintiff Grand Ronde's argument is based on the conclusion by a former member of this court that Section 18 "suggests that the IRA was intended to benefit only those Indians federally recognized at the time of passage."  *City of Sault Ste. Marie v. Andrus*, 532 F. Supp. 157, 161 n.6 (D.D.C. 1980).  Tellingly, however, the *City of Sault Ste. Marie* Court provides no further analysis and ultimately holds that "although the question of whether some groups qualified as Indian tribes for purposes of IRA benefits might have been unclear in 1934, that fact does not preclude the Secretary from subsequently determining that a given tribe deserved recognition in 1934. . ." because "[t]o hold otherwise would be to bind the government by its earlier errors or omissions."  *Id.* (finding that a 1972 Memorandum conferred recognition under the IRA).  Similarly, this Court does not view Section 18's voting provision as incompatible with an interpretation of Section 19 that allows for post-1934 recognition.[7]

### g.  Conclusion

For the above reasons, the Court finds that the term "recognized" does not unambiguously refer to recognition as of 1934, but rather is an ambiguous statutory term.  Moreover, given the above discussion and Justice Breyer's concurrence in *Carcieri*, this Court finds the Secretary's interpretation of the term "recognized" to be reasonable and defers to it.

---

[7]     It is unclear to the Court whether Grand Ronde is suggesting that the IRA covers only members and descendants of members of those reservations that could vote under Section 18 in 1934.  To the extent that Grand Ronde makes such an argument, the Court rejects it. As the Government points out, tribes that were not permitted to vote under Section 18 because they did not have a reservation have nevertheless organized under IRA.  *See* A.R. 134256 (Haas Report).

*See Cumberland Coal Res., LP v. Fed. Mine Safety & Health Review Comm'n,*, 717 F.3d 1020, 1025 (D.C. Cir. 2013) (explaining that under *Chevron*, once the court determines that the statute is ambiguous with respect to the specific issue, the court must defer to the Secretary's interpretation so long as it is reasonable).

### 2. "Under Federal Jurisdiction"

The Secretary's legal authority to acquire the Parcel in trust also requires a finding that the Cowlitz Tribe was "under federal jurisdiction" in 1934.  25 U.S.C. § 479; *Carcieri*, 555 U.S. 379 (2009).  To determine whether the Cowlitz Tribe was "under federal jurisdiction" in 1934, the Secretary developed a two-part test.  Plaintiffs argue that the Secretary's test violated the statutory text and legislative history of the IRA.  Plaintiffs further argue that the Secretary's application of this two-part test to the Cowlitz was arbitrary and capricious.  Below, the Court first describes the Secretary's test and then turns to the parties' specific arguments.

### a. Secretary's Two-Part Test

The Secretary developed a two-part inquiry to determine whether a tribe was under federal jurisdiction in 1934.

The first part of this test is

> whether the United States had, in 1934 or at some point in the tribe's history prior to 1934, taken an action or a series of actions – through a course of dealings or other relevant acts for or on behalf of the tribe or in some instance tribal members – that are sufficient to establish, or that generally reflect federal obligations, duties, responsibility for or authority over the tribe by the Federal Government.

*Id.*  According to the Secretary, "some tribes may be able to demonstrate that they were under federal jurisdiction by showing that Federal Government officials undertook guardian-like action on behalf of the tribe, or engaged in a continuous course of dealings with the tribe."  A.R.

140476.  The Secretary also determined that evidence regarding "actions by the Office of Indian Affairs" could satisfy this first stage.  *Id.*

The second part of the Secretary's test is "to ascertain whether the tribe's jurisdictional status remained intact in 1934."  *Id.*  As part of this inquiry, the Secretary noted that "the Federal Government's failure to take any actions towards, or on behalf of a tribe during a particular time period does not necessarily reflect a termination or a loss of the tribe's jurisdiction."  *Id.*  Similarly, the Secretary explained, "the absence of any probative evidence that a tribe's jurisdictional status was terminated or lost prior to 1934 would strongly suggest that such status was retained in 1934."  *Id.*

### b.  The Secretary's Two-Part Test Is Entitled to Deference

Plaintiffs argue that the Secretary's interpretation of "under federal jurisdiction" contravenes the plain text of § 479 as well as its legislative history.  First, Plaintiffs contend that the text of § 479 does not allow the Secretary to determine whether a tribe is "under federal jurisdiction" by looking at the actions taken by the Federal government towards *individual* tribal members.  For instance, Grand Ronde faults the Secretary for considering the fact that the Federal government provided medical attention to individual Cowlitz Indians and allowed individual Cowlitz Indians to attend BIA-operated schools.  Grand Ronde Mot. at 28.  Plaintiffs insist that the statutory text requires the Secretary to focus exclusively on Federal actions taken for the tribe as a whole.[8]  Clark Cty Mot. at 16; Grand Ronde Mot. at 21.

Next, Plaintiffs argue that the Secretary's interpretation of "under federal jurisdiction" contravenes legislative intent because Congress intended the "under federal jurisdiction"

---

[8]     Clark County Plaintiffs also argue that the Secretary's test is erroneous because it allows the Secretary to look at events occurring *prior* to 1934 to demonstrate that the tribe was under federal jurisdiction in 1934.  Clark Cty Mot. at 16.  This argument ignores the fact that the second part of the Secretary's test directly asks whether the tribe remained under federal jurisdiction in 1934.  Accordingly, the Court is not persuaded by this argument and rejects it.

requirement to narrow the tribal groups that qualify as Indians under § 479.  Clark County

Plaintiffs contends that the Secretary's interpretation does not allow the phrase "under federal

jurisdiction" to act as a limiting factor since almost all tribes have members that "interacted with

or received benefits from the United States."  Clark Cty Mot. at 17.  Similarly, Grand Ronde

further argues that § 479 should be interpreted as narrowing the types of tribal groups to only

those "tribes that were under 'Government supervision and control'" in 1934, and faults the

Secretary for finding that "mere dealings" with a tribe and its individual tribal members would

suffice to show such supervision and control over a tribe.  Grand Ronde Mot. at 28.

Defendants, for their part, insist that the Secretary's interpretation of "under Federal

jurisdiction" is a permissible construction of the IRA and informed by the agency's expertise in

Indian affairs, which they argue should be given deference.  Cowlitz Mot. at 14.

Section 479 defines Indians as "members of any recognized Indian tribe now under

Federal jurisdiction."  25 U.S.C. § 479.  The Secretary acknowledged that the phrase "under

Federal jurisdiction" qualifies the term "recognized tribe."  A.R. 140475.  The parties agree then

that under § 479, the tribe, as opposed to its individual members, must be under federal

jurisdiction.  The statute does not, however, explain what it means for a tribe to be "under

Federal jurisdiction," or describe what type of evidence a fact-finder may consider in making

that analysis.  Nothing in § 479 prohibits the Secretary from considering the relationship between

the Federal government and individual Indians when determining whether the tribe itself was

under federal jurisdiction in 1934.  Moreover, it strikes the Court as perfectly reasonable for the

Secretary to consider the relationship to the part (the tribal members) when trying to assess the

relationship to the whole (the tribe).  As such, the Court finds that the Secretary's test did not

violate the APA by considering the Federal government's relationship to individual tribal members when ascertaining whether a tribe as a whole was "under federal jurisdiction."

The Court is similarly unpersuaded that the legislative history for § 479 renders the Secretary's test erroneous.  According to the May 18, 1934 hearing transcript, the phrase "under federal jurisdiction" was suggested by Commissioner Collier after a colloquy between Senator O'Mahoney and Chairman Wheeler.  Chairman Wheeler expressed his concern that some "so called tribes'" were composed of "white people essentially," and yet because they were "under the supervision of the Government of the United States," they would receive benefits under the act.  A.R. 135301.  Senator O'Mahoney suggested in turn that the committee include a separate provision "excluding from the benefits of the act certain types."  *Id.*  At this point, Commissioner Collier proposed to add the phrase "now under Federal jurisdiction" after the words "recognized Indian tribe."  *Id.*  After this proposal, the hearing immediately ended and the phrase is not discussed any further.

This colloquy, as the Secretary's decision noted, is "ambiguous and confused."  A.R. 140475.  It remains entirely unclear what the legislators meant by the phrase "under Federal jurisdiction."  While the legislative history suggests that the phrase "under federal jurisdiction" was added to narrow the types of tribes that qualify for benefits under the IRA, it is not clear as to what tribes the legislators intended to exclude.[9]

---

[9]     As noted, the Commissioner introduced the phrase "under federal jurisdiction" in response to Chairman Wheeler's desire to exclude tribes that he felt were not sufficiently Indian although they were still "under the supervision of the Government of the United States."  Thus, one may argue that a tribe that was "under federal jurisdiction" was not necessarily "under the supervision of the Government."  Such a conclusion, however, not only undermines Grand Ronde's argument that "under federal jurisdiction" means that the tribe "must be under the supervision and control of the federal government," Grand Ronde Mot. at 20, but also contravenes the Secretary's interpretation of "under federal jurisdiction," which requires some level of federal supervision.  The Court notes this potential interpretation only to further highlight that the legislative history is ambiguous and not helpful.

Plaintiffs insist that the Secretary's interpretation of "under federal jurisdiction" defies the legislative intent because "[v]irtually any tribal group will have members who have interacted with or received benefits from the United States."  Clark Cty Mot. at 17.  But such an argument falsely portrays the Secretary's test as one that automatically grants "under federal jurisdiction" status once a tribe can show that its members received federal benefits and services in 1934.  This is a distortion of the test employed by the Secretary, which considers the federal services and benefits received by individual tribe members among other types of evidence, and asks if the evidence, when taken as a whole, is "sufficient to establish, or [] generally reflects federal obligations, duties, responsibility for or authority over the tribe by the Federal Government."  A.R. 140476.

In sum, the Court finds the legislative history to be exceedingly unhelpful, except that it confirms that the phrase "under federal jurisdiction" is indeed ambiguous and that *Chevron* deference is required.[10]  Accordingly, the Court is not persuaded that the legislative history renders the Secretary's test to be arbitrary, capricious or legal error.

### c.  The Secretary's Application of the Two-Part Test to the Cowlitz Tribe

In the Record of Decision, the Secretary found that the United States' 1855 treaty negotiations with the Lower Band of Cowlitz Indians were "the first clear expression that the Cowlitz Tribe (or its predecessors) was under federal jurisdiction."  A.R. 140478.  The proposed treaty called for the Cowlitz and the other tribes in the area to "cede all their claims to territory covering much of the southwestern Washington in exchange for a single reservation to be

---

[10]     The ambiguity of the phrase is further corroborated by a memo written by then Assistant Solicitor of the Department of Interior and one of the primary drafters of the initial legislation, Felix Cohen.  In this memo, Cohen observed that the Senate bill "limit[ed] recognized tribal membership to those tribes 'now under Federal jurisdiction, *whatever that may mean*."  A.R. 140468.  Based on his assessment, the Solicitor's Office recommended deleting the phrase "under federal jurisdiction," although that recommendation was evidently rejected or ignored.

provided later, most likely on the Pacific Ocean." *Id.* The Secretary determined that although the treaty negotiations failed, the government took the land, and "at a minimum, it demonstrates that the Federal Government acknowledged responsibility for the Tribe (or its predecessors)." *Id.*

According to the Secretary, for approximately a decade after the failed treaty negotiations, the Department of Interior recognized that Indian title to the Cowlitz's land had never been properly ceded. In 1904, the Cowlitz "began a prolonged effort to obtain legislation to bring a claim against the United States for the taking of their land." A.R. 140481. And although ultimately unsuccessful, the Tribe received support from both the Special Indian Agent who was tasked by the Department of Interior to review the claim and the local Superintendent. *Id.*

The Secretary further notes that from the mid-1850s until 1934, the Federal government continued a "course of dealings" with the Cowlitz Tribe. For instance, in 1868, Federal officials attempted to distribute goods and provisions to the Cowlitz Indians. A.R. 140479. In 1878, the Federal government "deemed it necessary to formally acknowledge two individuals to be 'chiefs' of the Lower and Upper Bands of the Cowlitz," and communicated with the Tribe through these individuals until 1912, when the chiefs died. *Id.* The Secretary also observes that the "local Superintendent also enumerated the members of both bands and then listed them together in that year's statistical tabulation," thereby demonstrating "unambiguous federal jurisdiction." A.R. 140479.

The Secretary further states that the Federal government provided for the Cowlitz's education and medical needs from the late 19th century and this "continued into the 20th century." A.R. 140479-140480. For instance, Cowlitz children attended schools operated by the Bureau of

Indian Affairs and the Department of Interior authorized money for "health services, funeral expenses, or goods at a local store on behalf of Cowlitz Indians." A.R. 140480. Moreover, the Secretary notes that "[t]he local Indian Agency representatives repeatedly included Cowlitz Indians as among those for whom they believed they had supervisory responsibilities." *Id.* For instance, "during the 1920s the Superintendent of the Taholah Agency represented the interests of the Cowlitz Tribe vis a vis state parties for purposes of Cowlitz Tribe's fishing rights." *Id.* In 1927, the Superintendent of the Taholah Agency clarified that "the Cowlitz band are under the Taholah Agency," and wrote that his jurisdiction included *inter alia* "all those Indians belonging to the . . . Cowlitz." *Id.* The Superintendent also described his 1923 traveling expenses to include travel to the reservations under his jurisdiction, which included the "Cowlitz Reservation located in the Cowlitz River Valley" (even though the Cowlitz did not formally have a reservation). *Id.* A.R. 140480-140481.

Next, the Secretary notes that the Federal government issued "public domain" allotments to some Cowlitz Indians in the late 1800s and "took actions in support of these allotments," such as supervising the sale of lands and protesting a tax sale of land held in trust. A.R. 140482-140483. Some Cowlitz Indians also received allotments due to "the Act of March 4, 1911" which directed the Secretary to make allotments to members of tribes in the State of Washington "who are affiliated with the Quinaielt and Quileute tribes." A.R. 140483. In its 1931 decision, *Halbert v. United States*, the Supreme Court determined that the Cowlitz members were entitled to such allotments. *Id.* (citing *Halbert v. United States*, 283 U.S. 753 (1931)). The Secretary points to the history of the Federal government granting allotments to the Cowlitz members as further evidence that the Tribe was "under federal jurisdiction" in 1934. A.R. 140484.

Lastly, the Secretary considered as "important" evidence of jurisdiction, the Department of Interior's 1932 approval of an attorney contract for the Cowlitz Tribe. By law, attorney contracts between Indian tribes and attorneys had to be approved by the Commissioner of Indian Affairs and the Secretary. Thus, the Superintendent from the Taholah Agency was sent by the Commissioner to observe meetings between the Cowlitz Tribe and the attorneys who planned to bring claims on behalf of the Tribe against the United States. Ultimately, the Commissioner and Secretary's First Assistant approved these attorney contracts. A.R. 140484.

The Secretary, after her detailed and extensive historical review, concludes that "[a]ll of this evidence, taken together, supports [the agency's] conclusion that prior to and including 1934 the Cowlitz Tribe retained and did not lose its jurisdictional status as a tribe "under federal jurisdiction." A.R. 140484.

### d.  The Secretary's Application of the Two-Part Test to the Cowlitz Did Not Violate the APA

According to Plaintiffs, the Secretary erred when she found that the Cowlitz Tribe was "under federal jurisdiction" as a result of the failed treaty negotiations. Grand Ronde Mot. at 27; Clark Cty at 19-20. According to Plaintiffs, "[a] failed treaty could never serve to bring a tribe under federal jurisdiction, because such failed negotiations create no 'obligations, duties, responsibility for or authority over the tribe' by the United States." Clark Cty Mot. at 20.

The Cowlitz Tribe argues in response that the treaty negotiations show that the Tribe was under federal jurisdiction because, upon the tribe's refusal of the treaty's terms, the United States "exercised its ultimate jurisdiction by simply dissolving the Tribe's aboriginal title [to its land] through an Executive Order." Cowlitz Mot. at 16. Similarly, the Government observes that the Upper Chehalis and Chinook tribes also took part in the same failed treaty negotiations as the Cowlitz, and despite the unratified treaty, the Federal government assumed control over their

tribal lands, "essentially treat[ing] the land as ceded."  Govt's Reply at at 4-5.  The Government

concludes that it "did not matter whether these tribes entered into a ratified treaty because the

Federal government unilaterally asserted jurisdiction over the tribes and their lands regardless."

*Id*. at 5.

As an initial matter, the Court agrees that the failed treaty negotiations do not, in and of

themselves, "establish, or . . . generally reflect federal obligations, duties, responsibility for or

authority over the tribe by the Federal Government."  However, the Secretary relies on much

more than the failed treaty negotiations to establish that the Cowlitz Tribe was "under federal

jurisdiction" in 1934.  More specifically, the Secretary relies on the "course of dealings" that

came after those failed treaty negotiations—*e.g.*, the granting of allotments to Tribal members,

the approval of the Tribe's attorney contracts, and the other federal services provided to the Tribe

and its members up to and including 1934.  *See supra* Part III.A.2.c.  The Secretary's

determination that the Cowlitz were "under federal jurisdiction" prior to and including 1934 was

based on "[a]ll of this evidence, taken together."  A.R. 140484.

Moreover, the Cowlitz's rejection of the proposed treaty does not mean that the Tribe

was not under federal jurisdiction in 1934.  If anything, the fact that the Federal Government

ignored the Tribe's demands and ultimately took its tribal lands without compensation,

corroborates that the Federal Government treated the Cowlitz as though the Tribe was under its

authority.  For these reasons, the Court finds the Secretary's determination that the Cowlitz Tribe

was "under federal jurisdiction" prior to 1934 was reasonable and not in violation of the APA.

Next, Plaintiff's contend that the Cowlitz could not have been under federal jurisdiction

in 1934 because the Tribe's relationship with the Federal Government had already been

"terminated"— as found by the NIGC in its Restored Lands opinion.  Grand Ronde Mot. at 22;

*see also* Clark Cty. Mot. at 19-20, 24-46.  Plaintiffs insist that termination "is the antithesis of

'Federal jurisdiction'" because it denotes the cessation of federal supervision and control over an

Indian tribe.  Grand Ronde Mot. at 22; *see also* Clark Cty Mot. at 21.  In response, Defendants

argue that a "termination" in the NIGC's restored lands opinion refers to an "administrative

termination" by the Department of Interior under IGRA, which is the statute that the NIGC

interprets in issuing a Restored Lands opinion.  Such an "administrative termination,"

Defendants maintain, is different than a termination by Congress, which is the only entity that

could legally terminate federal jurisdiction over a tribe.

The Court finds the NIGC's Restored Lands opinion to be of questionable value in

determining whether the Cowlitz Tribe was "under federal jurisdiction" in 1934.  The NIGC

determined in its Restored Lands opinion that the Cowlitz qualified for the IGRA's restored

lands exception because the Tribe had been ignored by the Department of Interior and the

Department "no longer had a government-to-government relationship with the Tribe."  A.R.

8200.  In other words, the Cowlitz Tribe was no longer formally recognized from "at least the

early 1900s" and was therefore deemed "terminated" under the IGRA.  A.R. 8199.  As the

Secretary explained, modern notions of "federal recognition" and its inverse, "termination," are

concepts that evolved in the 1970s, after the Department promulgated procedures by which a

tribe could demonstrate its status as an Indian tribe.  A.R 140468.  Federal courts have since

construed the restored lands exception under IGRA so that a cessation of administrative services

by the Department of Interior could amount to a *de facto* termination of a tribe.  *See e.g.*,

*TOMAC v. Norton*, 433 F.3d 852, 865 (D.C. Cir. 2006).

Using the NIGC's legal conclusions and findings, Plaintiffs argue that the Tribe cannot

be "under federal jurisdiction" under the IRA, if there was no "government-to-government

relationship" under IGRA.  Such reasoning incorrectly assumes, however, that a government-to-government relationship, as defined by IGRA and the federal courts interpreting IGRA, is a prerequisite to a tribe being "under federal jurisdiction" pursuant to IRA.  Importantly, under the Secretary's interpretation of "under federal jurisdiction," the actions or inactions of the Department of Interior are insufficient to extinguish the jurisdictional relationship between the federal government and an Indian tribe.  In other words, "Congress's constitutional plenary authority over [an] Indian tribe[] cannot be divested," even if the Department of Interior ignored the tribe.  A.R. 140476.  Therefore, a tribe could be "under federal jurisdiction" under the IRA while lacking a "government-to-government" relationship under the IGRA.  As noted by the Defendants, case law lends support to the Secretary's position.  *See TOMAC v. Norton*, 433 F.3d 852, 856 (D.C. Cir. 2006) (reciting Congress's statement that the Pokagon Band "was unfairly terminated as a result of both faulty and inconsistent administrative decisions contrary to the intent of Congress, federal Indian law and the trust responsibility of the United States"); *cf. United States v. John*, 437 U.S. 634, 653 (1978) (holding that federal jurisdiction existed over the prosecution of a crime that occurred on a reservation despite the "long lapse" in federal recognition).  According to the Secretary, the NIGC's Restored Lands opinion is an interpretation of the IGRA and not the IRA, and a finding of termination under the IGRA is not fatal to a finding that the Cowlitz were "under federal jurisdiction" pursuant to the IRA.  In reaching this conclusion, the Secretary has exercised her expertise in Indian affairs to construe ambiguous statutory language and in reconciling different approaches taken by different agencies as they exercise their responsibilities to Indian tribes.

Finally, Plaintiffs contend that the Secretary erred by dismissing unfavorable evidence that they claim shows the Cowlitz were not "under federal jurisdiction" in 1934.  Specifically,

Plaintiffs point to a 1924 statement in which the then-Secretary opposed legislation that would have allowed the Cowlitz to file a claim against the federal government.  The Secretary stated that that the Cowlitz Indians "are without any tribal organization, generally self-supporting, and have been absorbed into the body politic."  Plaintiffs also note a 1933 letter from the Commissioner Collier denying enrollment to an individual person in the Cowlitz tribe; in this letter Collier states that the Cowlitz was not in existence as it did not have a reservation or tribal funds on deposit under the government's control.[11]  Clark Cty Mot. at 22.

The Secretary did not ignore the evidence cited by Plaintiffs, but rather found that it was not persuasive in light of the rest of the record.  With respect to Commissioner Collier's 1933 letter, the Secretary determined that Collier's statement that the Cowlitz did not exist was "conclusory and unsupported," and therefore unpersuasive given the evidence raised in "the thorough analysis of the historical record performed for the [Cowlitz's 2002] acknowledgment decision," *i.e.* evidence that supported that the Cowlitz Tribe was a continuous political entity throughout the 20th century.  A.R. 140482.  For this same reason, the Secretary discredited the 1924 statement by the then-Secretary of Interior describing the Cowlitz as "without any tribal organization," "self-supporting," and "absorbed into the body politic."  A.R. 140480.  Moreover, the Secretary determined the 1933 letter was further undermined by Commissioner Collier's statement the very next year, in 1934, in which he instructs the local Taholah Superintendent to enroll any Cowlitz Indians that were under his jurisdiction as Cowlitz even though they had received an allotment on the Quinault Reservation.  A.R. 140482.  Thus, the Secretary did all that the APA requires—she considered the 1933 letter and 1924 statement as well as other evidence and briefly explained why she remained persuaded that the totality of evidence tipped

---

[11]     Plaintiffs also point to evidence that the Cowlitz lacked formal recognition, *i.e.* had been "terminated."  However, as discussed above, the Secretary reasonably concluded that formal recognition is not the same as being "under federal jurisdiction."

in favor of finding that the Cowlitz Tribe was under federal jurisdiction.  *See Bowen v. Am.*

*Hosp. Ass'n*, 476 U.S. 610, 626 (1986) (describing an agency's requirements under APA).

### 3.  Cowlitz's Membership Numbers

The Cowlitz Tribe increased its tribal members from 1,482 at the time it was first

federally acknowledged in 2002, to 3,544 members in 2007.  Pls. Clark Cty's Mot. at 24.  Clark

County Plaintiffs argue that the Secretary neglected her duty under 25 C.F.R. § 83.12 to confirm

that the new Tribe members "maintained social and political ties with the tribe and either

descend from members on the base roll or from the historic tribe."  *Id.* at 24.  The Secretary's

failure to do so, Clark County Plaintiffs contend, voids the Secretary's decision that she was

authorized to take the Parcel into trust on behalf of the Cowlitz.  *Id.* at 27.  Among other

arguments,[12] Defendants counter that Clark County Plaintiffs never presented this argument at

the administrative level and have therefore waived it.  Cowlitz Mot. at 16; Gov't Mot. at 34,

n.30.  Clark County Plaintiffs insist that they "clearly raised the issue of the Tribe's greatly

expanded enrollment" at least three times.  Clark Cty Reply at 16.

"While there are surely limits on the level of congruity required between a party's

arguments before an administrative agency and the court, respect for agencies' proper role in the

*Chevron* framework requires that the court be particularly careful to ensure that challenges to an

agency's interpretation of its governing [laws] are first raised in the administrative forum."

*Koretoff v. Vilsack*, 717 F.3d 394, 397 (D.C. Cir. 2013) (quoting *NRDC v. EPA*, 25 F.3d 1063,

1074 (D.C. Cir. 1994)).  Accordingly, courts require that a party in an APA action raise only the

---

[12]        Defendants also argue that Clark County Plaintiffs lack standing to raise this issue.  "Although
standing is usually a threshold inquiry, both the Supreme Court and this Circuit have long recognized the
propriety of avoiding difficult, constitutionally-based justiciability issues when a case is more simply
resolved on another basis."  *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 811 (D.C.
Cir. 1993).  Because the Court concludes that Clark County Plaintiffs waived this issue, the Court does
not decide whether Clark County Plaintiffs had standing to challenge the Secretary's alleged failure to
properly review the Cowlitz membership numbers.

"specific argument" that was raised to the agency and "not merely the same general legal issue." *Id.* "This principle applies to legal, as well as factual, arguments." *Tindal v. McHugh*, 945 F. Supp. 2d 111, 129 (D.D.C. 2013) (citing *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1290 (D.C. Cir. 2004) (per curium) ("To preserve a legal or factual argument, . . . [a] proponent [must] have given the agency a 'fair opportunity'' to entertain it in the administrative forum before raising it in the judicial one."))

Plaintiffs point to communications— one newspaper editorial and two legal correspondences— in which they took issue with the Cowtliz Tribe's membership expansion. Clark Cty. Reply at 16. In these communications, Clark County Plaintiffs argued that the BIA had tarnished the integrity of the NEPA process by relying on Cowlitz Tribe's overstated membership figures. *See* A.R. 92207; A.R. 86688; A.R. 572. More specifically, the Clark County Plaintiffs argued that the public should be given an opportunity to provide comments and challenge the membership figures. *Id.* Insofar as Clark County Plaintiffs challenge the integrity of the NEPA process before this Court (arguments which are discussed in detail later in this opinion), such arguments are preserved.

However, Clark County Plaintiffs never voiced any concern at the administrative level that the Secretary's statutory authority to take the land in trust was somehow impugned because she had not reviewed the Cowlitz membership figures. Nor did the Clark County Plaintiffs previously argue that the Secretary has an ongoing obligation under 25 C.F.R. § 83.12 to review a tribe's membership figures before taking land into trust on the tribe's behalf. Under the waiver doctrine, Plaintiffs cannot raise such arguments now. *See NRDC v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir. 1994) ("failure to raise a particular question of statutory construction before an agency

constitutes waiver of the argument in court," even if the party had made "other technical, policy, or legal arguments").

**B.     The Secretary Did Not Violate the APA in Concluding that the Parcel Qualifies for Gaming under the IGRA**

As described above, Section 20 of the IGRA allows gaming on lands that the Secretary acquired in trust so long as the lands are the tribe's "initial reservation."  25 U.S.C. § 2719(b)(1)(B)(ii).  Because the IGRA does not define "initial reservation," the Secretary determines whether the tribe meets the "initial reservation" exception when she decides to take land into trust.  *Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 462-63 (D.C. Cir. 2007).  Under the pertinent agency regulations, a land may qualify as an "initial reservation" if, *inter alia*, it is "within an area where the tribe has significant historical connections."  25 C.F.R. § 292.6.  A tribe demonstrates "significant historical connections" by presenting "historical documentation [of] the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[13]  25 C.F.R. § 292.2.  As the Secretary determined, the regulations do not define the term "vicinity."

Plaintiffs argue the Secretary erred in her determination that the Parcel is eligible for gaming under the "initial reservation" exception of the IGRA.  More specifically, Plaintiffs contend that the Cowlitz cannot have "significant historical connections" to the Parcel because it was 14 miles outside of the Cowlitz's aboriginal territory, the boundaries of which were defined by the Indian Claims Commission (ICC).[14]  Grand Ronde Mot. at 33-34; *see also* Clark Cty at

---

[13]     Although not applicable here, a land may also be of "significant historical connections" if it is within the boundaries of the tribe's last reservation.  25 C.F.R. § 292.2.

[14]     In *Plamondon v. United States*, 21 Ind. Cl. Comm. 143 (June 25, 1969), a Cowlitz tribal member petitioned the ICC to be compensated for Cowlitz lands taken by the United States in the nineteenth century.  A.R. 140501-02; 140507.  The tribal member petitioning the ICC was required to show "actual, exclusive, and continuous use and occupancy prior to loss of the land in order to be compensated for a

30.  According to Plaintiffs, both the regulation's text and the overarching purpose of the IGRA require the Secretary to interpret "significant historical connection" by considering whether the tribe has shown "long term" occupancy and use in the land "directly surrounding" the Parcel. Grand Ronde Reply at 36.  Plaintiffs further argue that the Secretary's broad interpretation of "significant historical connection" "constitutes a wholesale departure" from the agency's prior decisions.  Grand Ronde Mot. at 36.

Defendants counter that the regulations "do not require that the land be previously 'owned or possessed' by the tribe, or be at the center of its historic territory," but rather the Cowlitz need only show historic use and occupancy in the vicinity of the Parcel.  Cowlitz Reply at 21.  Defendants further argue that ICC-determined boundaries cannot demark the lands where the Cowlitz have "significant connections" because the ICC's boundaries are based on stricter standards, *i.e.* a tribe must show actual, exclusive, and continuous use and occupancy of the land. Id. at 45-46.  Additionally, Defendants insist that the Secretary's decision is consistent with the agency's prior decisions that address the "significant historical connections" requirement under the IGRA.  *Id.* at 46.

### 1.   The Secretary's Interpretation of "Significant Historical Connection" Did Not Contravene the Plain Language of the Regulations or the IGRA's Purpose

The Secretary determined that the Parcel qualifies as the Cowlitz's "initial reservation." Specifically, the Secretary found that the Cowlitz Tribe had demonstrated its significant historical connection to the Parcel through evidence that the Tribe had occupied or used land in the vicinity of the Parcel.  ROD 126; A.R. 140507.  Plaintiffs fault the Secretary's interpretation of "significant historical connection" as overly broad.  According to Plaintiffs, a tribe that seeks

---

taking of their aboriginal titles."  A.R. 140501.  After a thorough historical analysis, the ICC set forth the boundaries of the Cowlitz aboriginal territory in its *Plamandon* decision.  A.R. 131966.  These boundaries excluded the Parcel, which was situated fourteen miles to the south of the Cowlitz aboriginal territory. A.R. 140502.

to demonstrate its "significant historical connections," must show that its occupancy or use of the

land was "long-term" and took place on the land itself or "adjacent" to it, and that the tribe had

some "claim of ownership . . . to the land."  Grand Ronde Reply at 34.  However, the plain

language of 25 C.F.R. § 292.2 provides that a tribe seeking an initial reservation proclamation

may demonstrate its significant historical connections to the land through evidence of the tribe's

"occupancy or subsistence use in the vicinity of the land."  The regulation does not require that

the occupancy and use be "long term" or that the tribe claim any ownership or control, exclusive

or otherwise, over the land.  Nor does the regulation require the Cowlitz Tribe to have occupied

or used the Parcel or the land adjacent to it.[15]

Indeed, during the notice and comment process for the rule, the agency specifically

considered and rejected several changes to the definition of "substantial connection," which

would have aligned with the Plaintiffs' stricter interpretation.  One commenter expressed

concern that "the word 'area,' as it relates to the term 'significant historical connection' is too

broad," and sought to limit gaming to ancestral homelands.  73 Fed. Reg. 29,354, 29,360.  In

refusing to adopt the recommendation, the agency noted that "the actual land to which a tribe has

significant historical connection may not be available."  *Id.*  Other comments suggested that "the

significant historical connection requirement should be uninterrupted connection" or "show

---

[15]     Relatedly, Clark County Plaintiffs argue that the Secretary failed to address whether the Parcel
was *within an area* where the Tribe has significant historical connections" because she did not "define a
specific area in order to determine that the Parcel falls 'within' it."  Clark Cty Reply at 30.  According to
the Clark County Plaintiffs, the Secretary was required to use "the combination of historical
connections—burial grounds, villages, occupancy and subsistence use" to define the parameters of 'the
area 'within' which a parcel qualifies as an initial reservation."  *Id.* at 30-31.
        Again, Plaintiffs are reading in additional requirements to the regulatory language.  While the text
of 25 C.F.R. § 292.6 requires that the Parcel be "within an area" where the Cowlitz had significant
historical connections, the Secretary reasonably interpreted this to mean that the Cowlitz Tribe needed to
have significant historical connections to the Parcel itself.  Therefore, defining the "parameters" of an
"area" would serve as a useless exercise.  Accordingly, the Court rejects the argument that the Secretary
erred by not defining "an area" pursuant to § 292.6.  Such an argument masks the real disagreement
among the parties: the limits of what lands are in the "vicinity" of the Parcel under 25 C.F.R. § 292.2.

historically exclusive use," but the agency rejected both recommendations because such requirements "would create too large a barrier to tribes in acquiring lands and they are beyond the scope of the regulations and inconsistent with IGRA."  *Id.*  In sum, the agency rejected a more restrictive definition of "significant historical connection" because, among other reasons, it did not comport with the IGRA.

As the D.C. Circuit explained, the purpose of the "initial reservation" exception is to "ensur[e] that tribes lacking reservations when the IGRA was enacted are not disadvantaged relative to more established ones."  *Citizens Exposing Truth about Casinos*, 492 F.3d at 467 (D.C. Cir. 2007) (quoting *City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003)).  A stricter approach to defining a significant historical connection may arguably frustrate this objective by making it more difficult to allow gaming on newly established reservations, thereby hurting the economic development of newly recognized tribes.

Plaintiffs argue that the Secretary's interpretation violates the IGRA's purpose because it "give[s] newly recognized tribes an advantage over pre-existing tribes," since the former can "choose the location of their land acquisitions so as to maximize casino revenue."  Grand Ronde Mot. at 32.  Such an argument might persuade the Court if the Secretary's test allowed newly recognized tribes to select their locations without limitation.  But this is hardly the case.  Instead, the Secretary, invoking her expertise in balancing the competing interests of newly recognized and pre-existing tribes, has issued regulations requiring that a newly recognized tribe seeking to game on its initial reservation meet three requirements.  Specifically, "the tribe must demonstrate the land is located within the State or States where the Indian tribe is now located . . .  and within an area where the tribe has significant historical connections," as well as display "one or more . .

. modern connections to the land," as defined by the regulation. 25 C.F.R. 292.6.  Such a test is

far from the free-for-all scenario that Plaintiffs suggest.

In sum, the plain language of the regulation does not unambiguously require a finding of

"long term" use or occupancy on the land "directly surrounding" the Parcel.  Moreover, the

Secretary's interpretation does not frustrate the purpose of the IGRA and the initial reservation

exception.  Congress left it up to the Secretary's expertise to determine when a land qualifies as

an "initial reservation."  *See Teva Pharms. USA. Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006).

("It is up to the agency to bring its experience and expertise to bear in light of competing

interests at stake and make a reasonable policy choice."); *id*. at 4 ("When a statute is ambiguous,

Congress has left a gap for the agency to fill.").  As such, the Court properly defers to the

Secretary's interpretation.

### 2.   The Secretary Did Not Depart from Prior Decisions in Her Interpretation of "Significant Historical Connection"

Plaintiffs argue that the Secretary's decision departs from agency precedent which they

claim "had consistently required petitioners to show that their desired gaming site was within

their historical territory."  Grand Ronde Mot. at 37.  In support, Plaintiffs note prior decisions

where the Secretary relied on the location of the gaming site "within territory that the tribe ceded

to the United States, settled on, or aboriginally controlled (or some combination of the three.)."

*Id.* at 37.  Plaintiffs also argue that the Secretary's prior decision, *Scotts Valley Band of Pomo*

*Indians*, requires the Cowlitz to demonstrate that its tribal members used or occupied the Parcel

itself and not just the land 14 miles outside of the Parcel.  *Id.* at 39.

As discussed above, the regulations do not require the Cowlitz to demonstrate that the

Parcel is within the Tribe's "historical territory," or that the Tribe used or occupied the Parcel

itself.  The regulations simply require that the Parcel be located within an area where the tribe

has significant historical connections, which, in turn, can be demonstrated through tribal use or occupancy of land in the vicinity of the Parcel.  Nevertheless, "[i]t is textbook administrative law that an agency must provide a reasoned explanation for departing from precedent or treating similar situations differently."  *West Deptford Energy, LLC v. FERC*, 2014 U.S. App. LEXIS 16406, at *25 (D.C. Cir. August 26, 2014).  Therefore, the Court turns to investigate whether the agency departed from its precedent in deciding that the Cowlitz Parcel qualified as an initial reservation.

In *Scotts Valley Band of Pomo Indians*, the agency elaborated on the regulatory meaning of "vicinity," explaining that a tribe's "subsistence use and occupancy requires something more than a transient or occasional presence in the area," and rejecting a definition of vicinity based solely on the land's proximity to the parcel.  Doc. 23-7 at 218-19.  The agency explained that "significant historical connection" may be found even if the "tribe lacks any direct evidence of actual use or ownership of the parcel itself."  *Id.* at 219 ("[I]t would be unduly burdensome and unrealistic to require a tribe to produce direct evidence of actual use or occupancy on every parcel within a tribe's historic use and occupancy area.").  The agency further elaborated that

> a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired lands depends on the nature of the tribe's historic use and occupancy, whether those circumstances lead to the natural inference that the tribe used or occupied the newly acquired land.  This analysis is, necessarily, fact-intensive, and will vary based on the unique history and circumstances of any particular tribe.

*Id.* at 219, n.59.  Thus, contrary to the Plaintiffs' argument, the *Scotts Valley* opinion did not require the Cowlitz to show direct evidence of historic use or occupancy of the Parcel itself, but rather that the Parcel was in the vicinity of "a particular site with direct evidence of historic use or occupancy."

The Secretary applied the *Scotts Valley* standard in finding that the Cowlitz had demonstrated "significant historical connections" to the Parcel.  A.R. 140507 (quoting *Scotts Valley*).  The Secretary begins her analysis by adopting the ICC's findings that the land 14 miles north of the Parcel was exclusively used and occupied by the Cowlitz.  A.R. 140507.  The Secretary explained that the ICC boundaries demarcated an area of exclusive use and occupation by the Cowlitz, but did not encompass all of the land that the Tribe historically occupied and used for subsistence.  A.R. 140517.  Applying *Scotts Valley*, the Secretary then turned to "look at how the Cowlitz Indians used and/or occupied the lands to the south of the exclusive use and occupancy area determined by the ICC," and ultimately concluded that there was sufficient evidence of use and occupancy in that area to support the natural inference that the Cowlitz used or occupied the Parcel as well.  A.R. 140508.

In particular, the Secretary found the following evidence of the Cowlitz occupancy and use in the vicinity of the Parcel to be credible: (1) the Cowlitz's occupancy, namely hunting camp sites and "treaty-time" villages, at Warrior's Point, a site on the Columbia River and only three miles from the Parcel; (2) the Cowlitz reliance on the natural resources of the Columbia River for subsistence use and trade; (3) Cowlitz' "extensive and intensive" trading activities at both Bellevue Point (ten miles from the Parcel), and the intersection of the Lewis River and Columbia River (three miles from the Parcel);[16] (4) a major battle between the Cowlitz and the

---

[16]     The Secretary acknowledged that the agency had previously rejected a trading route as demonstrating significant historical connections.  A.R. 140514.  In *Guidiville Band of Pomo Indians*, the agency found that "evidence of the Band's through a trade route . . . does not demonstrate the Band's subsistence use or occupancy within the vicinity of the Parcel," because "something more than evidence that a tribe merely passed through a particular area is needed to establish a significant historic connection to the land."  Doc. 23-4 at 44.  The Secretary, however, found that the facts surrounding the Cowlitz's "extensive and intensive trading activities" were "substantial enough to be more than 'a transient presence in an area,'" and rejected the notion that *Guidiville* had made a bright-line rule that "activities associated with a trade route or trading activities in general can never constitute evidence of significant historical connections."  A.R. 140514.  The Secretary explained that the Cowlitz's evidence showed the Tribe had not "merely passed through the vicinity of the Cowlitz Parcel or were a disparate group of traveling

Chinook at a site three miles from the Parcel; (5) historical report about an individual Cowlitz

who used the Lewis River area for subsistence hunting, (about 6 miles from the Parcel); (6) the

fact that Cowlitz were expert boatmen and helped guide large boats carrying goods through the

mouth of the Lewis River, less than three miles from the Parcel; (7) census information showing

that the Cowlitz occupied the lands in the vicinity of the Parcel.  A.R. 140508-517.  In making

these findings, the Secretary reviewed and discussed several pieces of evidence, including those

materials submitted by Defendants.  A.R. 140517.  The Secretary's analysis and fact-finding

adequately supports and explains her conclusion that the Cowlitz had significant historical

connections to the Parcel.  Under such circumstances, the Court cannot substitute its judgment

for that of the agency.  *Verizon v. FCC*, 740 F.3d 623, 643-644 (D.C. Cir. 2014) (noting that the

Court must uphold the agency's "factual determinations if on the record as a whole, there is such

relevant evidence as a reasonable mind might accept as adequate to support the conclusion

(internal citation omitted)); *Mine Safety and Health Admin. v. Fed. Mine Safety & Health Review

Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997) ("An agency's conclusion may be supported by

substantial evidence even though a plausible alternative interpretation of the evidence would

support a contrary view.).

Plaintiffs argue that the evidence relied on by the Secretary cannot satisfy the significant

historical connections requirement because, under agency precedent, the Parcel must be "within

the Cowlitz "historical" territory, "as opposed to the fringes."  Grand Ronde Mot. at 37.

Plaintiffs specifically take issue with the fact that the Parcel is 14 miles from the ICC boundaries.

---

Indians."  A.R. 140513.  Because the Secretary offered a reasonable explanation as to why *Guidiville* was
distinguishable from the Cowlitz's case, no violation of the APA has occurred.  *ConAgra, Inc. v. NLRB*,
117 F.3d 1435, 1443-44 (D.C. Cir. 1997) ("It is axiomatic that an agency adjudication must either be
consistent with prior adjudications or offer a reasoned basis for its departure from precedent." (internal
quotations omitted)); *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011) ("When an agency departs
from its prior precedent *without explanation*, . . . its judgment cannot be upheld." (emphasis added)).

*Id.* at 38.  The Secretary reasonably explained, however, that the ICC boundaries demarked lands over which the Cowlitz had shown "actual, exclusive, and continuous use and occupancy," and that, while such a strict legal standard was required to establish aboriginal title before the ICC, it was not required to demonstrate "significant historical connections" under the regulations.  A.R. 140501-502.

Naturally, if a proposed gaming site falls within a tribe's aboriginal title area, the Secretary will highlight that fact when determining that a tribe has significant historical connections to the site—*i.e.*, if a tribe can demonstrate actual, exclusive, and continuous use and occupancy, the tribe will *a fortiori* meet the less stringent standard for significant historical connections, which only requires occupancy or subsistence use in the vicinity of the land.  Thus, it is unsurprising that Plaintiffs can list several prior agency decisions where the significant historical connections were found to exist because proposed gaming site was "within territory formerly occupied or controlled by [the] tribe."  *See* Grand Ronde's Reply at 40 (table compiling agency precedent).  However, this does not mean that a tribe *must* demonstrate that the proposed gaming site is within its aboriginal title area in order for the agency to find significant historical connections with the site.  Nor do Plaintiffs point to conflicting agency precedent that invokes such a legal standard.[17]  Finally, the Secretary's decision notes that it had previously determined that the Karuk Tribe of California had established significant historical connections "where the parcel owned by the Tribe was 38 miles from the tribal headquarters and not in an area of exclusive use by the tribe."  A.R. 140507.

---

[17]       To be sure, Plaintiffs attempt to extrapolate such a rule by highlighting the factual findings of prior agency decisions where the parcel was in the tribe's historical territory.  The Court agrees with Defendants that "Plaintiffs mistakenly emphasize the fact-specific differences between the various Indian land opinions based on each tribe's unique history instead of the legal test that is required to fit within the initial reservation exception."  Govt's Reply at 37.

For the above stated reasons, the Court finds that the Secretary's decision was not inconsistent with agency precedent, and does not violate the APA in her interpretation of "significant historical connection," nor in finding that the Cowlitz had demonstrated the Parcel qualified as an initial reservation under IGRA.

## C.  Environmental Challenges

Plaintiffs raise a host of challenges regarding the Secretary's compliance with NEPA. The Court first considers whether Grand Ronde has standing to pursue its NEPA claims, and then turns to the claims advanced by Clark County Plaintiffs.

### 1.  Grand Ronde Lacks Standing to Pursue its NEPA Claims

The Government argues that Grand Ronde lacks standing to raise its NEPA challenges because it has failed to show a "particularized environmental interest." The Government contends that Grand Ronde's allegations of future economic injury are "insufficient for purposes of standing under NEPA." Govt's Mot. at 47-48. To the extent that Grand Ronde is claiming aesthetic and recreational interests as to the Parcel, the Government argues that the record is devoid of any "evidence as to the manner in which its members view or recreate at or near [the Parcel]," or of facts "regarding the manner in which the proposed federal action would injure those interests." Govt's Reply at 40.

Grand Ronde argues that it has standing due to "its deep cultural and historic connections to the land on the north shore of the Colombia River, including Clark County." Grand Ronde Reply at 43. More specifically, Grand Ronde states that its "tribal members are buried in that area," and that it "considers Clark County to be part of its "Non-Treaty Homelands" and "Cultural Interest Lands."[18] *Id.* Grand Ronde concludes that it "has important aesthetic and

---

[18]     Grand Ronde asserts that the "[Final Environmental Impact Statement] itself recognized that Grand Ronde . . . has significant cultural and historic interests in the parcel." Grand Ronde Reply at 43.

recreational interests in maintaining its historic ties to this land— and in having the land

unaltered," and that such interests "would unquestionably" be injured by the Cowlitz

development. *Id.* at 44.

The plaintiff bears the burden of establishing the elements of Article III standing. *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  As relevant here, a plaintiff raising NEPA

challenges must demonstrate that it is under threat of suffering an "injury in fact that is concrete

and particularized."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a

procedural right without some concrete interest that is affected by the deprivation--a procedural

right *in vacuo*--is insufficient to create Article III standing).  "While generalized harm to . . . the

environment will not alone support standing, if that harm in fact affects the recreational or even

the mere esthetic interests of the plaintiff, that will suffice."  *Summers*, 555 U.S. at 494.  In

making this showing, the plaintiff cannot rest on general factual allegations of injury resulting

from defendant's conduct, but "must set forth by affidavit or other evidence specific facts."

*Lujan*, 504 U.S. at 561.

Grand Ronde refers the Court to two documents highlighting its "historic and cultural

connections to the north shore of the Columbia River."  A.R. 8616, *see also* A.R. 8558-59.  The

first document was prepared by Grand Ronde and entitled "The La Center Casino Fiasco: a brief

look at the legal and factual errors fatal to the Cowlitz Casino Project in La Center, Washington."

A.R. 8609.  Grand Ronde specifically points the Court to three bullet points which address Grand

Ronde's "historic and cultural connection to the north shore of the Columbia River."  A.R. 8616.

---

This statement is misleading at best.  The FEIS "identified three potentially interested parties in addition to the Cowlitz Indian Tribe: the Chehalis Confederated Tribes, the Yakima National, and the Shoalwater Bay Tribe."  A.R. 75977.  However, the FEIS explains that the agency reached out to Grand Ronde "per their request to be involved in the Native American consultation process."  A.R. 75978.  Thus, Grand Ronde cannot claim that the FEIS included them due to their cultural and historic ties to the Parcel when the tribe was not even identified as a "potentially interested party" but rather it asked to be involved.

The first bullet point notes the Willamette Valley Treaty of 1855 which "recognize[s] that bands to the south of the Colombia River have a legitimate claim to lands on the north shore of the River."  The next bullet point observes that "Grand Ronde's tribal members are buried at Fort Vancouver on the north side of the Columbia River in Washington."  *Id.*  The last bullet point states that "Grand Ronde considers Clark County, Washington part of its 'Non-Treaty Homelands' and 'Cultural Interest Lands.'"  *Id.*

The second document that Grand Ronde brings to the Court's attention is a 2007 letter from Grand Ronde to a Senior Cultural Resources Specialist employed by Analytical Environmental Services, a company that assisted in the agency in producing the Environmental Impact Statement.  A.R. 8558.  This letter states that Grand Ronde has historical and cultural connections to the Parcel, and specifically mentions the Willamette Valley treaty already described above.  A.R. 8558.

Assuming arguendo that these two documents sufficiently support Grand Ronde's recreational and esthetic interests in the north side of the Columbia River and Clark County, this is not enough to demonstrate a particularized, concrete injury-in-fact.  Grand Ronde does not provide evidence that shows whether or to what extent the development of the Parcel (which covers only a part of Clark County) would injure them.  As the Supreme Court has repeatedly made clear, "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly in the vicinity of it."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565-566 (U.S. 1992) (internal quotations omitted).  In other words, the Court must "assure itself that [Grand Ronde] plan[s] to make use of the specific sites upon which projects may take place."  *Summers*, 555 U.S. at 499.  The evidence provided fails to demonstrate Grand Ronde's interest in the Parcel itself.  *Id.* (explaining that standing "is not an

ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm").

Similarly, Grand Ronde neglects to provide any evidence – by affidavit or otherwise – that demonstrates how the proposed action would affect its recreational or esthetic interests in the Parcel. Instead, Grand Ronde simply asserts in its brief that "[a]llowing the Cowlitz to establish a reservation and build a casino on this site would unquestionably injure [its recreational and esthetic] interests."[19] Grand Ronde Reply at 44. As discussed above, such generalized, vague notions of harm do not meet the injury in fact element required for Article III standing. Accordingly, the Court holds that Grand Ronde lacks standing to pursue its NEPA claims.

### 2. Clark County Plaintiffs' Environmental Challenges

#### a. The Secretary Reasonably Relied on the Environment, Public Health and Safety Ordinance

By way of background, in 2004, Clark County and the Cowlitz entered into a memorandum of understanding (MOU), whereby the County agreed to provide services (*e.g.*, law enforcement, fire protection, emergency medical services) and in return the Tribe agreed to abide by Clark County's codes and ordinances and pay the County to offset County expenditures and impacts to County revenues. A.R. 140389. However, subsequent litigation unrelated to the instant case called into question the legal enforceability of the MOU. *Id.* As a result, the Tribe enacted an Environment, Public Health and Safety (EPHS) Ordinance in 2007. *Id.*

---

[19]    Grand Ronde refers the Court to *TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.D.C. 2002) to support its argument that injury is "unquestionable." Indeed, the court in *Tomac* found that the plaintiff had standing to challenge a proposed casino site. However, in that case, the plaintiff's members "live[d] within a few blocks of the casino, assert[ed] interests in viewing local wildlife, walking in their neighborhood, and enjoying their own properties." *Id.* at 187. Their properties were "immediately adjacent to a specific development project that will significantly and permanently alter the physical environment of their neighborhood." *Id.* at 187, n.1. Unlike here, the *Tomac* court was not left to speculate whether in fact an interest in the casino property existed and how that interest would be injured.

According to the Secretary, the EPHS Ordinance:

(i) obligated the Tribe to perform mitigation measures equivalent to those in the MOU, (ii) grants an irrevocable limited waiver of the Tribe's sovereign immunity to Clark County to allow an enforcement action by the County in state court, (iii) provides that the Tribe will not revoke or modify either the waiver of sovereign immunity or the environment, health and safety mitigation provisions of the Ordinance, and (iv) creates a Tribal Enforcement and Compliance Officer (TECO), whose duty is to ensure implementation and compliance with the EPHS Ordinance.

A.R. 140389-90.  In addition, the Tribe "passed a Gaming Ordinance Amendment that amended the Tribe's existing gaming ordinance and incorporated the entire Tribal EPHS Ordinance." A.R. 140390.  The NIGC approved this Gaming Ordinance Amendment in 2008.  *Id.* Eventually, Clark County and the Tribe agreed to rescind the MOU and exclusively rely on the EPHS Ordinance and the Gaming Ordinance "to provide the same mitigation of impacts as was provided in the MOU."  *Id.*

In her decision, the Secretary concluded that by incorporating the EPHS Ordinance, the Gaming Ordinance Amendment "includes mitigation measures equivalent to those in the MOU as part of the Tribe's gaming ordinance, giving the Federal Government enforcement authority to ensure that the mitigation measures are implemented."  *Id.*  Clark County Plaintiffs argue that the Secretary acted arbitrarily and capriciously in her conclusion that the EPHS Ordinance mitigated the "environmental and jurisdictional impacts" related to the Parcel's development.  Clark Cty Mot. at 32.  More specifically, Clark County Plaintiffs insist that "the EPHS Ordinance is revocable and . . . NIGC will not enforce it."  *Id.* at 37.  Furthermore, Clark County Plaintiffs argue that the Secretary violated the APA by not responding to comments and contrary authority concerning the NIGC's ability and authority to enforce the EPHS Ordinance.  *Id.* at 36-37.  The Defendants respond that the EPHS Ordinance is irrevocable and enforceable, and therefore the

Secretary did not act arbitrarily or capriciously when she relied on the Ordinance for the mitigation measures. [20]   Govt's Mot. at 62; Cowlitz Mot. at 54.

The Secretary's decision explicitly acknowledged Clark County Plaintiffs' concerns that the EPHS Ordinance "was revocable at the discretion of the Tribe," "did not provide relief to Clark County in State Court," and was unenforceable by NIGC.  A.R. 140411-12.  The Secretary responded to such concerns by highlighting two mechanisms through which she maintains the EPHS Ordinance is enforceable.  First, the Secretary found that Clark County could sue for relief or compliance in State Court because the Cowlitz Tribe had not only waived its sovereign immunity in the Ordinance but also reconfirmed the waiver in the MOU rescission agreement. A.R. 140412.  This is unsatisfactory to Clark County Plaintiffs, who fault the Secretary for treating the EPHS Ordinance as a contract instead of a "unilateral and revocable" legislative act. Clark Cty Mot. at 35.  However, "a tribe may voluntarily subject itself to suit by issuing a 'clear' waiver" of its sovereign immunity.  *Marceau v. Blackfeet Hous. Auth.*, 455 F.3d 974, 978 (9th Cir. 2006) (citing *C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 418 (2001)).  The Secretary's decision underscores her understanding that the Cowlitz had provided such a clear waiver and cannot, therefore, revoke the EPHS Ordinance without being held accountable in State Court.

Second, the Secretary explains in her decision that "the NIGC has the authority and ability to enforce" the EPHS Ordinance because it is part of a Gaming Ordinance and the NIGC has the power to close the gaming operation.  A.R. 140412.  Clark County Plaintiffs are

---

[20]   Defendants further argue that even if the EPHS Ordinance was revocable and unenforceable, "NEPA does not require that mitigation discussed in an EIS be enforceable and incapable of revocation," but rather requires only "a reasonably complete discussion of possible mitigation measures."  Govt's Mot. at 62; Cowlitz Mot. at 59.  As discussed above, the Court finds that the EIS discussed mitigation measures in "sufficient detail to ensure that environmental consequences have been fairly evaluated."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).  Under NEPA, no more is required.  *Id.*

concerned that the NIGC lacks the authority to enforce the EPHS Ordinance if the Cowlitz Tribe

revokes or amends the Ordinance.  A.R. 140412.  However, assuming *arguendo* that the Cowlitz

Tribe revokes the EPHS Ordinance, the regulations would allow NIGC to issue a Notice of

Violation which may ultimately result in temporary closure of the gaming operation.  *See* 25

C.F.R. §§ 573.3-573.4.  Moreover, as discussed above, Clark County could itself sue the Tribe in

State Court to prevent such revocation.

 While Clark County Plaintiffs may have preferred a more detailed decision, the Court

finds that the ROD contains a reasonable explanation as to why the Secretary believed the EPHS

was irrevocable and enforceable and, accordingly, *Chevron* deference is warranted.  *Miller v.*

*Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) ("While the Secretary could have provided a more

detailed explanation of his reasoning, we are required to uphold a decision of less than ideal

clarity if the agency's path may reasonably be discerned.  In addition, if the necessary

articulation of basis for administrative action can be discerned by reference to clearly relevant

sources other than a formal statement of reasons, we will make the reference." (internal

quotations and citations omitted)).

### b.   Secretary Considered Reasonable Alternatives as Required by NEPA

 Clark County Plaintiffs argue that the Secretary violated NEPA by using "unreasonable

screening criteria" to exclude "reasonable alternatives" to the Parcel.  Clark Cty Mot. at 38-39.

According to the Clark County Plaintiffs, the Secretary's criteria were too restrictive and were

applied unreasonably because even the Parcel did not meet the criteria.  *Id*. at 40.  Furthermore,

Clark County Plaintiffs note that the Secretary eliminated certain alternatives by claiming that

those sites could not adequately meet the Cowlitz Tribe's economic objectives.  But such a

determination, Clark County Plaintiffs argue, was erroneous because it was based on the Cowlitz

Tribe's own assessment as to its economic needs and such an assessment was suspect.  *Id.* at 41.

Clark County Plaintiffs contend that the Secretary failed to conduct an independent evaluation as

to the Tribe's enrollment figures and economic needs as required under 40 C.F.R. § 1506.5(a),

and as such failed to make a "full informed and well-considered" decision as required by

NEPA.[21]  *Id.* at 42; Clark Cty Reply at 34-36.

Defendants maintain that the Secretary complied with NEPA's requirements, as the

decision briefly discusses the reasons for eliminating alternatives deemed incompatible with the

stated agency's objective.  Cowlitz Mot. at 49.  Furthermore, Defendants argue that it was

permissible for the agency to consider and accept information from the Tribe's economic

analysis, because an independent review of the Cowlitz economic needs would have been

inappropriate given the Cowlitz's tribal sovereignty.  Govt's Mot. at 52; Cowlitz Mot. at 47.

Moreover, the Government argues that 40 C.F.R. § 1506.5(a) applies only to "environmental

information," and, therefore, does not require an independent evaluation of the economic

information supplied by the Cowlitz.

---

[21]      In its reply, Clark County Plaintiffs argue that the agency "tinker[ed] with [the] purpose and need
statement" after the draft EIS in order to make some alternatives less viable.  Clark Cty Reply at 33.  The
Government responds that the changes to the purpose and need statement, which included references to
the Unmet Needs Report, were made in response to public comments inquiring why sites located further
north could not be analyzed.  Govt's Reply at 43.
         In *City of Grapevine v. Department of Transportation*, the petitioners similarly argued that the
Federal Aviation Administration reacted to criticism to the draft EIS by "manipulat[ing] the statements of
need and purpose to avoid considering any alternatives except for those that achieve what has been the
FAA's unmistakable goal from day one."  17 F.3d 1502, 1506 (D.C. Cir. 1994).  The D.C. Circuit
"pass[ed] over the facile implication that the [agency] harbored an improper motive for changing the
statement of purpose in the FEIS."  *Id.*  The Circuit explained that "[t]he very purpose of a DEIS is to
elicit suggestions for change," and that "[t]he resulting FEIS must be evaluated for what it is, not for why
the drafter may have made it so."  *Id.*
         Thus, like *City of Grapevine*, the agency here was permitted to change the purpose and need
statement after the draft EIS.  So long as the agency provided a reasoned consideration to the alternatives,
NEPA is satisfied.  *Id.* (stating that a "hard look" is all that was required, even when the agency had
changed the purpose statement in reaction to criticism after the draft EIS).

Courts review an agency's selection of alternatives under the "rule of reason," which requires "considerable deference to the agency's expertise and policy-making role." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011). Under this approach, courts "first consider whether the agency has reasonably identified and defined its objectives. The agency's choice of alternatives are, then, evaluated in light of these stated objectives; an alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'" *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999). Courts must reject an "unreasonably narrow" objective "that compels the selection of a particular alternative." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 (quoting *Citizens Against Burlington*, 938 F.2d at 195-96).

Here, the agency's reasonably identified its objective in its FEIS:

> to establish a Tribal Headquarters from which [the Cowlitz] Tribal Government can operate to provide housing, health care and other government services, and from which it can conduct the economic development necessary to fund these Tribal Government services and provide employment opportunities for its members.

A.R. 75837. Clark County Plaintiffs and Defendants do not disagree that this broad purpose statement invites "a very wide range of alternatives." Clark Cty Mot. at 39; *see* Govt's Mot. at 51. Indeed, the agency originally identified 19 possible project locations. A.R. 75882. The agency then applied specific criteria to narrow 19 alternatives down to the 11 alternatives that were deemed feasible.[22] Such action was proper, since the agency was only required to consider feasible alternatives. *City of Grapevine v. Department of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir.

---

[22] To determine the feasibility, the agency analyzed each of the 19 alternative sites using the following factors: 1) Proximity to the I-5 freeway; 2) Contiguous properties forming 20 acres or more; 3) Contiguous ownership; 4) Availability for purchase; 5) Environmental constraints; 6) Availability of public services; and 7) Underlying zoning designation. A.R. 75886.

1994). ("The range of alternatives that the agency must consider is not infinite, of course, but it does include all "feasible" or "reasonable" alternatives to the proposed action." ).  The FEIS discusses each of these alternatives and briefly provides reasons for dismissing all but one of the alternatives to the Parcel.[23]  A.R. 75882-75886; *City of Grapevine*, 17 F.3d at 1506 (The "rule of reason governs both which alternatives the agency must discuss, and the extent to which it must discuss them.").

Clark County Plaintiffs specifically take issue with the agency's exclusion of five alternative sites that were located farther north than the Parcel.  The agency commissioned three individual market studies which found that these alternative sites were too "inconvenient to both the Seattle and Portland/Vancouver markets" and therefore could "not adequately meet the economic objectives and needs of the Tribal government."[24]  A.R. 75886.  Given that economic development of the Tribe was the main objective of the project, this explanation is plainly reasonable.  *See Citizens Against Burlington*, 938 F.2d at 196 (an agency is required to "take into account the needs and goals of the parties involved in the application").

Nevertheless, Clark County Plaintiffs challenge the agency's reasoning because the Cowlitz's "economic objectives and needs" were measured using the Tribe's own report.  Indeed, the agency adopted the Cowlitz's self-assessment of its financial and socioeconomic needs; the Statement of Purpose explicitly refers to the Cowlitz's Tribal Business Report (also referred to as Unmet Needs Report).[25]  A.R. 75837.  Again, "the rule of reason" guides the

---

[23]     Along with the Parcel site, the FEIS analyzed the possibility of development on the "Ridgefield Interchange Site."

[24]     The FEIS also notes that "these alternative sites [were] located in more rural, less developed areas where the potential for adverse impacts would likely be more significant."  A.R. 75886.

[25]     The Cowlitz Tribal Business Report, describes a need of $113 million annually to fund its anticipated Tribal programs for its 3,544 tribal members, 20% of which are unemployed. These Tribal

Court's evaluation.  *Citizens Against Burlington*, 938 F.2d at 196 (noting that courts evaluate an agency's methodology by applying the "rule of reason").  Specifically, the Court inquires whether the agency acted reasonably in relying on the Cowlitz Tribe's self-reporting as to its needs.

After reviewing the record on which the agency relied, the Court finds that the agency actions were reasonable.  First, the Cowlitz's Report is not unreasonably conclusory, but rather provides a detailed assessment of the Tribe's current socioeconomic status, highlights Tribal programs that either need improvement or are currently not offered, and offers a qualitative and quantitative description of future tribal programs.  A.R. 92993- 93019.  Additionally, second-guessing a tribe's economic needs and socioeconomic development goals would result in the agency undermining the tribe's sovereignty.  Such an outcome would be especially troubling given that the agency perceives its main role in the project as advancing the Tribe's "self-determination" by "promoting the Tribe's self-governance capability."  A.R. 75837.  Finally, Clark County Plaintiffs fail to point to any statute or regulation that would require the agency to conduct an independent evaluation of the economic data provided by the Cowlitz Tribe.  The only regulation that Clark County Plaintiffs point to, 40 C.F.R. § 1506.5(a), requires an agency to independently evaluate "*environmental* information," not the type of socioeconomic information that is at issue here.  Because Clark County Plaintiffs' interpretation of § 1506.5(a) would render the term "environmental" superfluous, the Court finds it unpersuasive.  *See Amoco Prod. Co. v. Watson*, 410 F.3d 722, 733 (D.C. Cir. 2005) (instructing courts to "construe a statute so as to give effect to every clause and word" where possible).  As such, the Court is persuaded

---

programs include: Tribal Government, Health Care and Social Services, Housing, Elder Care Services, Education, Cultural Preservation, Transportation, Environment and Natural Resources, and Tribal Enterprises.

that the agency's adoption of the Cowlitz's Report was not arbitrary or capricious and that the Secretary acted reasonably in reviewing alternative sites.

### c.   The Secretary Sufficiently Addressed Water Issues[26]

By way of background, the East Fork Lewis River is "the primary surface water within the vicinity" of the Parcel.  A.R. 75913.  McCormick Creek is also "within the watershed" in which the Parcel is located.  A.R. 75916.  Both of these bodies of water are listed as "impaired waters" based on their fecal coliform numbers and temperature issues.  A.R. 75916.  Impaired waters are regulated under the Clean Water Act using Total Maximum Daily Loads (TMDLs).  A TMDL is a calculation of the maximum amount of a pollutant that a water body can receive and still meet water quality standards.  33 U.S.C. § 1313(d).  Although the East Fork Lewis River is "currently in the study phase of TMDL development for fecal coliform and temperature," it lacks a TMDL to help determine "how much existing pollution needs to be reduced to keep the water healthy."  A.R. 75916.

The Clean Water Act prohibits discharge into surface waters like the East Fork Lewis River and McCormick Creek unless the source has a National Pollution Discharge Elimination System (NPDES) permit.  Under CWA regulations, a NPDES permit cannot be issued "[t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards."  40 C.F.R. § 122.4(i).  Thus, arguably, a

---

[26]      In addition to water issues, Clark County states in a footnote that the FEIS relied on "incorrect land [use] designation" for the Parcel because it states that it is "light industrial" when in fact the correct designation is "agricultural resource lands."  Clark Cty Mot. at 37 n.18.  The Government responds that "[r]egardless of the designation, . . . the FEIS stated the current land uses at the site and in the surrounding area and described how Cowlitz's proposal would affect those uses."  Therefore, the Government concludes that any change in land designation "did not present any significant new information bearing on the proposed action's impacts."  Govt's Mot. at 2.  Clark County did not reply to the Government's argument, and, therefore, the Court treats Clark County Plaintiffs' argument regarding land designation as conceded.  *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

NPDES permit cannot be given to the Cowlitz for their casino-resort (a new source) unless TMDLs are developed for the East Fork Lewis River.

Clark County Plaintiffs argue that the FEIS's consideration of water impacts is inadequate because it does not address the "highly likely possibility" that the Cowlitz will be unable to obtain a National Pollutant Discharge Elimination System (NPDES) permit for the casino-resort development. Clark Cty Reply at 40; Clark Cty Mot. at 42. According to Clark County Plaintiffs, the FEIS cannot "simply state[] that the Tribe will comply with the Clean Water Act and NPDES requirements," but rather, under NEPA, the Secretary must be provided with information assuring her that the environmental impacts on water can be mitigated and that the Cowlitz will be able to comply with the Clean Water Act. Clark County Reply at 41-42.

Defendants respond that the agency satisfied NEPA by taking a "hard look" at the water impacts of the project. Cowlitz Mot. at 51; Govt's Mot. at 60. The Cowlitz Tribe maintains that the DEIS "evaluated existing water resources and the potential impacts of the Project on those resources," and then the FEIS "reviewed and responded to public comments on the DEIS analysis and added a supplemental water study." Cowlitz Mot. at 52. Similarly, the Government notes that the FEIS includes the fact that the Cowlitz will need a NPDES permit and that the FEIS appendices "include extensive reports on wastewater treatment." Govt's Mot. at 60. According to the Government, the agency was not required "to consider the possibility that a permit could not be obtained and Cowlitz would operate its facilities unlawfully." Govt's Reply at 43.

The critical issue here is whether NEPA required the EIS to include the possibility that an NPDES permit would not be issued. In determining that no such requirement exists, the Court finds guidance in *Robertson v. Methow Valley Citizens Council et al*. In that case, the Forest

Service had prepared an EIS as part of its decision to issue a special-use permit for the operation of a ski area in federal lands. 490 U.S. 332 (1989).   The Ninth Circuit found the EIS inadequate under NEPA because "not only ha[d] the effectiveness of the[] mitigation measures not yet been assessed, but the mitigation measures themselves ha[d] yet to be developed." *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 817 (9th Cir. 1987).   For instance, the Ninth Circuit found that the EIS's discussion on air quality was inadequate because it included an air quality management program as a mitigation measure when that program had not yet been developed.  *Id.*   The Ninth Circuit interpreted NEPA to require "this type of inquiry and analysis" before the Forest Service issued the special-use permit for the ski-area.  *Id.* at 818.  Moreover, the Ninth Circuit held that the EIS's discussion concerning the impact that the project would have on a large migratory deer herd was inadequate because the study on the impacts to the herd was ongoing.  *Id.*   The Ninth Circuit stated that if the Forest Service had difficulty obtaining adequate information to make a reasoned assessment of the environmental impact on the herd, it had a duty to make a so called "worst case analysis."  *Id.* at 817-18.

In reversing the Ninth Circuit's decision, the Supreme Court clarified an agency's duties under NEPA to take a "hard look" at the environmental consequences of a proposed federal action.  The Supreme Court explained that "there is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352-53 (1989).  In other words, NEPA does not "demand the presence of a fully developed plan that will mitigate environmental harm before an

agency can act." *Id.* Under *Robertson*, then, the EIS is not required to discuss the outcome of mitigation measures.

As in *Robertson*, the EIS here was not required to provide a full evaluation as to whether the NPDS permit, a mitigation measure, would issue or predict what would happen in "the worst case scenario," *i.e.*, that the Cowlitz would be denied the permit altogether. *Id.* at 353. ("Because NEPA imposes no substantive requirement that mitigation measures actually be taken, it should not be read to require agencies to obtain an assurance that third parties will implement particular measures."). Neither NEPA nor its regulations require the EIS to evaluate the likelihood that permits will be obtained by a project applicant. Instead, the EIS need only list those permits required and discuss water impacts "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Id.*; 40 C.F.R. 1502.25(b) (requiring the draft EIS to list "all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal"). It is clear that the FEIS in the instant case met these requirements.

The FEIS describes the quality of surface water (*i.e.*, the East Fork Lewis River, McCormick Creek, and an unnamed stream by the proposed casino site) by reporting in detail on fecal coliform, ammonia, turbidity, and temperature conditions. A.R. 75913-75918. The FEIS also thoroughly discusses wastewater treatment programs and the expected quality of treated wastewater, again addressing anticipated fecal coliform, ammonia, turbidity, and temperature conditions. A.R. 76082-76085. Moreover, both the draft EIS and FEIS listed the NPDS permit when discussing mitigation measures that the Cowlitz would implement. *See e.g.*, A.R. 106594-106603; 106638; 106651; 106653. Under *Robertson*, NEPA requires no more for informed decision-making.

### d. Supplemental EIS is Not Required

A couple of months after the Secretary issued her ROD, in June 2013, Clark County "adopted stronger storm water management and erosion control standards that apply to all new development, redevelopment, and drainage projects." Clark Cty Mot. at 45.  Clark County Plaintiffs argue that the FEIS does not address these "new changes in the law regarding storm water" which would "set a much higher bar for storm water management than what was reviewed in the FEIS." *Id.* at 45. Thus, Clark County Plaintiffs ask that the Court remand and require the agency to prepare a supplemental EIS. Clark Cty Mot. at 43.  Defendants respond that the changes to the Clark County Code do not present "changes to the project or its resulting impacts," and therefore do not warrant supplementation.  Govt's Suppl. Response at 1.[27]  The Court agrees with Defendants.

A supplemental EIS is required when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).  These stormwater changes are not "significant" because, as Defendants point out, local environmental laws will not apply to the Parcel once it is accepted into trust, but rather the Parcel shall be subject only to federal and tribal environmental laws.[28] A.R. 140491.  Clark County Plaintiffs insist that the local Code still plays a significant role because the Tribe will not be issued a NPDES permit unless it meets Washington's water quality standards, which include "stormwater flow conditions similar to those required of Clark

---

[27]     Defendants originally failed to respond to Clark County Plaintiffs' argument that a supplemental EIS was necessary.  In an effort to provide some finality to this drawn out dispute, the Court ordered Defendants to respond to Clark County Plaintiff's argument.  *See* Minute Order (Nov. 12, 2014).  The Court has considered the parties' supplemental briefing in reaching its decision.

[28]     The Tribe did agree to comply with some local standards when it executed the EPHS Ordinance/Gaming Ordinance that was discussed earlier.  These standards included the stormwater law that was in place in 2004.  A.R. 76073.

County."  Clark Cty Pls.' Mot. at 4-5.  However, for the reasons already discussed above, NEPA does not require that the Secretary evaluate the likelihood that the NPDES permit will issue.  *See supra* Part III.C.2.c.  Accordingly, the Court agrees that no supplemental EIS is required under these circumstances.

## IV.  CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motions for summary judgment and grants Defendants' cross-motions for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

December 12, 2014

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE